**TENANTS AND OWNERS IN OPPOSITION TO REDEVELOPMENT ("TOOR"), etc., et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT ("HUD") et al., Defendants.**

**No. C-69 324 SAW.**

United States District Court,
N. D. California.

April 30, 1970.

As Supplemented Nov. 9, 1970, June 30, 1971, July 11, 1972, Jan. 11, 1973, July 19, 1973.

See also, D.C., 406 F.Supp. 1060.

Sidney M. Wolinsky, J. Anthony Kline, Public Advocates, San Francisco, Cal., and Amanda Hawes (formerly with San Francisco Neighborhood Legal Assistance Foundation and now with:) Legal Aid Society of Alameda County, Oakland, Cal., for plaintiffs.

Henry F. Davis, Michael A. DiSanto, San Francisco Redevelopment Agency, and Frederick P. Furth, San Francisco, Cal., James L. Browning, Jr., U. S. Atty., Northern District of California, San Francisco, Cal., Richard F. Locke, Asst. U. S. Atty., for defendants.

FINDINGS AND CONCLUSIONS ON MOTION FOR PRELIMINARY INJUNCTION; ORDERS ON MOTIONS FOR DISMISSAL AND PARTIAL SUMMARY JUDGMENT

WEIGEL, District Judge.

Plaintiffs are individuals who reside within the Yerba Buena Center Redevelopment Project Area D–1 in San Francisco and an unincorporated association (Tenants and Owners in Opposition to Redevelopment—"TOOR"). On their own behalf and on behalf of all others similarly situated, they charge that their statutory and constitutional rights are being violated in connection with that Project. Plaintiffs ask for declaratory relief and for an injunction prohibiting the defendant San Francisco Redevelopment Agency from dislocating residents of the Yerba Buena Project Area and prohibiting the Department of Housing and Urban Development (hereinafter "HUD") from further funding of the Yerba Buena Project until defendants have complied with their statutory and constitutional obligations to plaintiffs.

The Court undertook to assist the parties in reaching a settlement of the complicated practical problems which must ultimately be solved in the interest of fair and effective resolution of their controversies. Since it has become clear that the parties are unable to reconcile their differences, the Court must now pass upon plaintiffs' motion for a preliminary injunction and defendants' motions to dismiss as well as counter motions for partial summary judgment.

### THE PROJECT AND THE STATUTES

The Yerva Buena Project Area is a low income residential and commercial

district which, because of its proximity to the downtown business section of San Francisco, offers exceptional opportunities for commercial and financial development. (*See generally* plaintiffs' Exhibit 74, "A Major Opportunity to Invest in Downtown San Francisco".) The project was begun in the early 1960's with the execution of a Survey and Planning Contract between the Redevelopment Agency of the City and County of San Francisco and the federal Housing and Home Finance Agency. (Exhibit 1 of the Administrative Record —hereinafter "Ad.Rec.".) After initial approval in July, 1965 (Ex. 4, Ad.Rec.), the Redevelopment Agency was advised, on November 10, 1966, by letter from the Federal Regional Director of Urban Renewal, that the application for a loan and grant contract had been approved (Ex. 8, Ad.Rec.). The contract was closed on December 2, 1966, providing for a capital grant in the amount of $31,155,279 and the establishment of a temporary loan fund of $49,754,729. (Ex. 10, Ad.Rec.) While the Plan itself does not specify the precise figures, none of the parties before the Court has challenged the fact that the Project, unless modified, will destroy low rent housing for over 3,000 persons and provide less than 300 new low rent units. (Defendants' admissions 30 & 31.)

The Housing Act of 1949, as amended, 42 U.S.C. § 1441, et seq., lays down statutory requirements which govern urban renewal contracts between the federal government and local renewal agencies. 42 U.S.C. § 1455 provides that "Contracts for loans or capital grants shall require that

. . . . . .

(c)(1) There shall be a feasible method for the temporary relocation of individuals and families displaced from the urban renewal area, and there are or are being provided, in the urban renewal area or in other areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the individuals and families displaced from the urban renewal area, decent, safe, and sanitary dwellings equal in number to the number of and available to such displaced individuals and families and reasonably accessible to their places of employment.

. . . . . .

(c)(2) As a condition to further assistance after August 10, 1965 with respect to each urban renewal project involving the displacement of individuals and families, the Secretary shall require, within a reasonable time prior to actual displacement, satisfactory assurance by the local public agency that decent, safe, and sanitary dwellings as required by the first sentence of this subsection are available for the relocation of each such individual or family.

Basically, these sections require the local redevelopment agency to provide a plan for relocating persons out of urban renewal areas which plan must be approved by HUD as part of the initial program approval and again just prior to actual relocation.

In attempting to meet the requirements of § 1455(c)(1), the Redevelopment Agency of San Francisco submitted (with the Yerba Buena Project Plan —Ex. 16, Ad.Rec.) a Relocation Plan in early 1966 (Ex. 6, Ad.Rec.). It purported to show to HUD how residents dislocated from the Yerba Buena area would be rehoused. This Plan was approved by the Regional Administrator, by the Acting Deputy Assistant Secretary for Renewal, and finally, on October 18, 1966, by the Assistant Secretary for Renewal and Housing Assistance, Department of Housing and Urban Development. (Ex. 7, Ad.Rec.)

Although § 1455(c)(2) may not otherwise have applied to the Yerba Buena Project, since Yerba Buena was officially approved prior to August 10, 1965, the operative date of that section, HUD informed the Redevelopment Agency in the approval letter of November 10, 1966 (Ex. 8, Ad.Rec.), that the Agency should

comply with the Local Public Agency Letter No. 346 (Ex. 9, Ad.Rec.) which implements § 1455(c)(2). *See* Western Addition Community Organization v. Weaver, 294 F.Supp. 433, 436 (N.D.Cal. 1968) (hereinafter "WACO"). Letters concerning approval under § 1455(c)(2) were exchanged beginning in May, 1967 and on May 29, 1969, the Agency received final federal approval as required by (c)(2).

Plaintiffs allege five basic causes of action. They contend, first, that the Relocation Plan does not meet the requirements of § 1455(c) and the regulations promulgated thereunder in that approval of the Plan by HUD was arbitrary and without substantial basis in fact. In this connection, plaintiffs contend further that, irrespective of whether or not the Plan was valid in November, 1966 or May, 1969, residents of the Project area are in fact being relocated into housing which does not meet the required standards. Second, plaintiffs claim that they have been denied due process of law because they were not accorded adequate hearings prior to the approval of the Redevelopment and Relocation Plans. Third, plaintiffs urge that the Project denies them equal protection of the laws. Fourth, they assert that defendants violated the HUD regulation requiring consultation with minority groups. Finally, plaintiffs contend that the Redevelopment Plan includes a luxury hotel in violation of 42 U.S.C. § 1456(g).

## MOTIONS TO DISMISS

■ The federal defendants maintain that plaintiffs do not have standing to sue under the Federal Housing Act, 42 U.S.C. § 1441 et seq. While this was once the law in this Circuit (*see* Johnson v. Redevelopment Agency of City of Oakland, 317 F.2d 872 (9th Cir. 1963), cert. denied, 375 U.S. 915, 84 S.Ct. 216, 11 L.Ed.2d 154 (1963)), the Supreme Court has recently redefined standing requirements. Under this most recent formulation, plaintiffs clearly have standing to maintain this action. *See* Association of Data Processing Service

Organizations, Inc. v. Camp, Controller of the Currency, 397 U.S. 167, 90 S.Ct. 838, 25 L.Ed.2d 200 (1970); *see also* Barlow v. Collins, 397 U.S. 167, 90 S.Ct. 830, 25 L.Ed.2d 200 (1970); Norwalk CORE v. Norwalk Redevelopment Agency et al., 395 F.2d 920 (2d Cir. 1968); Western Addition Community Organization v. Weaver, 294 F.Supp. 433 (N.D. Cal.1968); Powelton Civic Home Owners Ass'n v. Department of Housing and Urban Development, 284 F.Supp. 809 (E.D.Pa.1968); Note, Judicial Review of Displacee Relocation in Urban Renewal, 77 Yale L.J. 966 (1968).

■ The federal defendants further argue that venue as to them does not lie in this Court under 28 U.S.C. § 1391(e) because not all defendants are officers or employees of the United States. This claim must fall under the decisions in Macias v. Finch, 324 F.Supp. 1252 (N. D.Cal.1970) and in Powelton Civic Home Owners Ass'n v. Department of Housing and Urban Development, 284 F.Supp. 809 (E.D.Pa.1968). The reasoning in those cases makes it clear that this Court has personal jurisdiction over the defendant Romney and that venue here is proper.

■■ The defendants also move to dismiss on grounds of collateral estoppel. They argue that the Relocation Plan was found valid in Silver v. San Francisco Redevelopment Agency, unreported decision, California Court of Appeal, 1st App.Dist., Div. 1, No. 1 (Civ. No. 25233 May 13, 1969), and that the *Silver* decision is binding on this Court as determinative of the issues here presented. The rule of collateral estoppel is that where an issue of fact or law "essential to the judgment is actually litigated and determined by a valid and final judgment, the determination is conclusive between the parties." Restatement, Judgments 68(1)(2). Neither the parties in *Silver* nor the issues there presented are before this Court. The plaintiffs in *Silver* were Yerba Buena property owners, not residents. The defendants in *Silver* included none of the federal defendants before the Court here. The statutory is-

sues discussed in *Silver* involved state law, not the federal Housing Act of 1949, the crucial statute in this case. In fact, *Silver* was decided prior to the § 1455(c)(2) approval which is under attack here. None of the constitutional arguments presented in this case were determined in *Silver*, and the court there expressly reserved to plaintiffs and their class the right to raise the constitutional arguments at a later date. *Id.* at 23. The argument that collateral estoppel bars this Court from consideration of the issues here presented is wholly without merit.

Finally, the federal defendants argue that this Court does not have subject matter jurisdiction over the issues here raised. They argue: That plaintiffs have not met the $10,000 jurisdictional amount requirement of 28 U.S.C. § 1331(a), (*see* Rosado v. Wyman, 414 F. 2d 170 (2d Cir. 1969); that jurisdiction will not lie under the mandamus statute, 28 U.S.C. § 1361, because the actions by the federal defendants involved in this case are discretionary (*see* Seebach v. Cullen, 224 F.Supp. 15 (N.D.Cal.1963), aff'd 338 F.2d 663 (9th Cir. 1964), cert. denied, 380 U.S. 972, 85 S.Ct. 1331, 14 L.Ed.2d 268 (1965)); and that the Administrative Procedure Act, 5 U.S.C. § 701 et seq., does not give this Court jurisdiction.

■ Contrary to defendants' contentions, jurisdiction is plainly and fully provided for by the Administrative Procedure Act. Section 702 (5 U.S.C. § 702) states that "a person suffering legal *wrong* because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." Such judicial review is precisely what plaintiffs seek. Since they have standing, the only remaining question is whether the Administrative Procedure Act specifically excludes the kind of review they seek. Section 701 states that judicial review is not available if it is precluded by statute or committed exclusively to agency discretion. There is no provision in the Housing

Act of 1949, as amended, precluding judicial review of the agency decisions under attack here. Nor can immunity against such review be inferred. "[P]reclusion of judicial review of administrative action adjudicating private rights is not lightly to be inferred . . . Indeed, judicial review of such administrative action is the rule, and nonreviewability an exception which must be demonstrated." Barlow v. Collins, 397 U.S. 159, 166, 90 S.Ct. 832, 837 25 L.Ed.2d 192 (1970). *See also* Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 631 (1967). Nowhere in the Housing Act is there the slightest indication that Congress intended to preclude judicial review of the Secretary's approval of relocation plans.

■ The agency decision at issue in this case is not one committed to agency discretion. 42 U.S.C. § 1455 states that "[c]ontracts . . . *shall* require that . . . there *shall* be a feasible method for the temporary relocation of individuals and families . . . The Secretary *shall* issue rules and regulations to aid in implementing the requirements of this subsection . . . Such rules and regulations *shall* require that there be established . . . [a] relocation assistance program . . ." § 1455 states further that the "Secretary *shall* require . . . *satisfactory* assurance . . ." (emphasis added). The statute speaks in mandatory terms. The specific requirements of § 1455(c)(1) and (c)(2) with respect to rents, distances from places of work, nature of the dwellings and "satisfactory assurance" bespeak statutory limitation upon the discretion of the Secretary. The Secretary's power and duty to approve a valid Relocation Plan, far from being a decision which is "committed to agency discretion by law," is carefully limited by the language Congress employed in the statute. Whether or not the Secretary has met the statutory requirements is a question reviewable by the courts.

Plaintiffs, as has been noted, have undertaken to state five causes of action which are now considered, seriatim.

### PLAINTIFFS' CLAIMS RE RELOCATION

Plaintiffs' first and principal charge ·is that the federal defendants have approved a Relocation Plan and are currently providing funds for the Project in violation of 42 U.S.C. § 1455(c)(1) & (2) and that the local defendants are unlawfully forcing relocation of residents for whom adequate relocation housing is not available. The rights claimed by plaintiffs in this connection stem from three provisions of the Housing Act.

Defendants are proceeding under a loan and grant contract. Section 1455(c)(1) declares that such contracts must require "a feasible method for the temporary relocation of individuals and families displaced from the urban renewal area . . ."

■ Section 1455(c)(2) provides that as a condition to further federal assistance after August 10, 1965, the "Secretary shall require, within a reasonable time prior to actual displacement, satisfactory assurance" that adequate relocation housing is available. The section is intended to insure that· a Relocation Plan approved pursuant to subsection (c)(1) is still satisfactory just prior to actual displacement. In that interest, (c)(2) requires submission of a new Relocation Plan or, at the very least, submssion of evidence indicating that the (c)(1) Plan is still valid.

■ The third statutory obligation goes back to § 1455(c)·(1) which provides not only that there shall be a feasible method (i. e., plan) for relocation at the outset, but also that the loan and grant contract shall require that "there are or are being provided" dwellings which meet the substantive requirements of (c)(1). Both parties to the contract, the Department of Housing and Urban Development and the local public agency, are thus under a continuing obligation to insure the availability of relocation housing which meets the standards of the statute. In other words, even if a plan is properly approved at the time the contract is made, and even if supplementary information properly gives the Secretary satisfactory assurance just prior to actual displacement, both the federal and the local defendants remain under a continuing obligation to provide adequate housing at all times during the relocation process.

Determination of the standard of judicial review is the threshold question in considering plaintiffs' claims that these statutory obligations were violated. Plaintiffs ask the Court to "reverse" the Secretary's decisions if they were not supported by "substantial basis in fact". The local defendants argue that this Court's inquiry is limited to a determination of whether or not the Secretary's approvals were arbitrary, capricious or discriminatory, and that, accordingly, the approvals should stand even if supported only by slight evidence. The federal defendants argue that the Secretary's decisions are totally discretionary and that review is limited to determining if approval was given.

■ Previous decisions on the question of scope or standard of judicial review have been few and confusing. In Garrett v. City of Hamtramck, Civ. No. 32004 (E.D.Mich. March 7, 1969), the Court enjoined an urban renewal project because "defendants have failed to convince the Court that this housing now in existence will provide adequate low-cost rental units to meet the needs of those individuals who face displacement as shown in the comprehensive renewal program." Id. at 7. Hamtramck placed the burden on the defendants to prove to the Court that the relocation was adequate. In WACO, the Court stated that the Secretary's action was reviewable "to the extent of determining whether the Secretary's discretion . . . has been exercised not arbitrarily but reasonably upon some substantial and supporting factual basis." 294 F.Supp. at 443. In a subsequent decision, dissolving the preliminary injunction in WACO, the Court made clear that its scope of review was limited simply to determining whether the Secretary's decision was arbitrary and without basis

in fact. *See* unreported decision, Civ. No. 49053, March 5, 1969. Although the Court in *WACO* may have changed its standard of review between the first and second opinions (*see* Note, Enjoining Urban Renewal—Inadequate Relocation Facilities: Western Addition Community Organization v. Weaver, 21 Hastings Law Journal 433, 445 (1970)), this Court concludes that the Court in *WACO* consistently limited review to a determination of "arbitrariness." The phrase "substantial basis in fact" in the first *WACO* opinion means only that a court should fully explore the record on the question of arbitrariness. It does not mean that a court should overturn a non-arbitrary decision by the Secretary because, in the court's view, the decision was not supported by *substantial* evidence.

The statute commits substantial powers of complex decision making to an executive department which is or should be staffed by highly trained personnel. Because of this and based on the reasoning in *WACO*, the Court concludes that judicial review is limited to the legal question of whether or not there was any basis in fact for the Secretary's decisions. However, the fact that judicial review is limited cannot absolve this Court from the duty of thorough examination of the record.

In undertaking such an examination, the Court's focus has been on the record underlying the (c)(2) approval. Even if the (c)(1) approval in 1966 was erroneously given, it has been superseded by the May, 1969, (c)(2) approval. (Of course, the earlier Plan is still relevant insofar as it was the basis of the 1969 approval. But it is the 1969 approval which is at issue here.)

In reviewing the (c)(2) approval of the Yerba Buena Project, it is necessary (for reasons which will become clear in a moment) to examine the (c)(2) approval of the closely related Western Addition Redevelopment Project. In a letter dated August 15, 1967, the Agency transmitted to HUD a document entitled "Status of the Program of the San Francisco Redevelopment Agency for Rehousing Residents of the Western Addition Area A-2". (Ex. 11, Ad.Rec.) That letter and the accompanying report constituted the Agency's attempts to fulfill the requirements under (c)(2) as to the Western Addition Redevelopment Project. The letter stated that the Program submitted was "at a minimum a statement of assurance from the Members of the San Francisco Redevelopment Agency on the adequacy of relocation resources for the renewal program of that project." On July 29, 1968, HUD accepted this Program as satisfactory assurance subject to four conditions, two of which will be later considered at some length. (The conditions are set out in a letter of July 29, 1968, from Regional Administrator to Redevelopment Agency, (Ex. 11, Ad.Rec.)). On January 24, 1969, the Agency gave its response to the four conditions and they were approved on January 29, 1969. (*See* unreported decision in *WACO*, Civ. No. 49053, March 5, 1969).

The Yerba Buena (c)(2) approval followed a similar pattern. (See Ex. 11, Ad.Rec.) On August 13, 1968, the Assistant Regional Administrator wrote to the Redevelopment Agency requesting a statement of assurance on the adequacy of the housing resources for the Yerba Buena Project. On August 20, 1968, the Agency replied that the transmittal of August 15, 1967, was intended to be the Agency's assurance for Yerba Buena as well as for the Western Addition. On September 13, 1968, the Regional Administrator replied that "we are accepting your statement that the Agency Members did take into consideration the adequacy of resources for Yerba Buena Center along with Western Addition A-2 even though no specific mention is made of this." The HUD letter went on to say that the July 29, 1968 letter concerning Western Addition was equally applicable to Yerba Buena—in other words, that the four conditions in that letter had to be satisfied before (c)(2) could be satisfied. On March 17, 1969,

the Regional Administrator again wrote the Agency stating, in effect, that the four conditions in the July 29, 1968 letter had not yet been officially satisfied for Yerba Buena. On May 9, 1969, the Agency presented its responses to the four conditions and on May 29, 1969, HUD gave its final approval to the Relocation Plan with a finding that the assurances of August, 1967 and May 9, 1969, taken together, were satisfactory.

The starting point in analyzing the record before the Secretary is, then, the August 15, 1967 report. Although the major portion of this document deals with Western Addition, section 9 includes a HUD form 6122 (Estimated Housing Requirements and Resources for Displaced Families) covering the redevelopment projects in Western Addition, Yerba Buena, and Hunters Point. This form contains the Agency's statistical conclusions as to the availability of housing for displaced persons. In reaching these conclusions, the Agency relied on the Relocation Plans submitted at earlier stages of the Western Addition and Yerba Buena Redevelopment Projects, as well as on a Housing Report which had been done for the Agency in 1967 by one E. M. Schaffran and Company. In reviewing the Agency's assurances, HUD was required to examine both the housing reports and the statistical conclusions contained in form 6122 in order to make a determination that the substantive requirements of § 1455(c)(1) had been met.

The substantive requirements of § 1455(c)(1) can be divided into two parts. First, the statute requires that there be relocation dwellings "equal in number to the number of and available to such displaced individuals and families . . ." In other words, there have to be at least as many available vacant dwellings as the number of dwellings to be destroyed by the redevelopment. Second, these dwellings have to meet certain standards: (a) they must be "not generally less desirable in regard to public utilities and public and commercial facilities . . . and rea-

sonably accessible to their [the displaced residents'] places of employment"; (b) they have to be "at rents or prices within the financial means of the individuals and families displaced"; and (c) they have to be "decent, safe, and sanitary". Plaintiffs argue that the Relocation Plan did not in May, 1969 properly establish that there would be sufficient vacancies, the first requirement of the statute and that, furthermore, the vacancies which were established did not meet the substantive standards of the statute.

The plaintiffs' argument that the Plan did not properly indicate the number of vacant dwellings which could be expected in San Francisco during the period of relocation is based on four separate claims. The plaintiffs argue, first, that the housing reports relied on by the Redevelopment Agency use the concept of "turnover" to reach estimates of the number of vacancies and that the turnover concept is invalid and misleading. (The concept of turnover in calculating housing vacancies is to make the bald assumption that the total number of vacancies which will be available over a certain future period of time is some multiple of the vacancies which came open during a prior and lesser period of time.) Defendants do not refute the charge that turnover is an invalid and misleading technique for estimating vacancies. Indeed, they would stand on weak ground if they did so since HUD now prohibits the use of turnover in assessing relocation resources. HUD Regional Circular 907 states at page 10:

"Some LPA's have utilized the turnover concept in formulating their relocation plans, i. e., a number of units is expected to become available, as a result of turnover, for rehousing displaced households. This approach has very limited applicability, if any, in ascertaining available relocation housing resources.

Turnover, in essence, represents the process by which one occupied unit becomes vacant and reoccupied. It is a 'neutral' process with respect to alter-

ing the supply of excess housing, i. e., the number of units which are in excess of the combined amount required to accommodate locality households and provide for mobility. It is only the excess units—or vacancies—which can be considered as supplying relocation housing resources for displaced families.

The limited applicability, if any, that the turnover concept possessed would be only within the absolute numerical limits of vacant housing units. That is, to say, for planning purposes, turnover units that can be used for relocation cannot exceed in amount the number of vacant standard housing units that are in excess of the minimum amount required for mobility. Turnover units and vacant units are not additive."

■ This Court does not have to reach an independent conclusion on the degree to which turnover is used in the Relocation Plan, since HUD officials already have made such a determination. In a HUD memorandum dated August 21, 1967, the Director of HUD's relocation branch stated that "it should be noted that the entire relocation plan is based on turnover with the exception of 200 units of new public housing which will not be available." *See WACO*, 294 F.Supp. at 439. Thus, on the basis of its own regulations, HUD admits that the Plan does not accurately reflect the number of vacancies in San Francisco. (*See also* plaintiffs' Ex. 68, p. 16, lines 10–18).

Plaintiffs' second claim is that the determination of the number of vacancies was erroneous because it relied on public housing as a source of vacancies. In support, plaintiffs point out that there is now and was at the time of the (c)(2) approval a waiting list for public housing of some five or six thousand eligible persons. (Plaintiffs' Memorandum in Support of Preliminary Injunction, at 23; *see also* plaintiffs' Ex. 84.)

The plaintiffs' third argument in support of their claim that the Plan overes-

timated the housing vacancies for relocated families and individuals is that the Plan relied on the existing housing supply in violation of HUD Regional Circular 907. That circular, promulgated in February, 1968, states that communities which have a vacancy rate of less than 3% may not rely on existing vacancies in the community for the purposes of relocation. A Relocation Plan in such a community may be approved by HUD if "housing of appropriate size and price levels will be added to the inventory in sufficient amount, on a one-to-one basis, to meet the needs of all categories of families and persons to be displaced by such HUD programs." Plaintiffs state that the vacancy rate in San Francisco is considerably less than 3%, and there is no question but that housing demolished in Yerba Buena is not going to be replaced on a one-to-one basis. (Local defendants' responses to plaintiffs' request for admissions number 30 and 31.)

Neither party has pointed to a specific study which was before the Secretary indicating what the exact vacancy rate was in May, 1969. Plaintiffs have introduced evidence (attachment to affidavit of Richard Thomson Le Gates dated November 3, 1969) which indicates that, at some unspecified time in 1969, the vacancy rate in San Francisco for dwellings renting for less than $100 a month was virtually 0.00. (Plaintiffs' Ex. C; *see also* plaintiffs' Ex. 79.) Defendants deny this and have submitted their own study to show that the vacancy rate is adequate. (Defendants' Ex. 10a.)

Although the evidence tends to support plaintiffs' claim, the Court makes no specific finding on this issue at this time.

■ Plaintiffs' fourth and final attack on the Plan's conclusion that there are sufficient vacancies is that the Plan relies on the same sources as those relied on for the Western Addition Project. The August, 1967 submission, which contains the 6122 forms for both Yerba Buena and Western Addition, specifically states that the two projects,

as well as the Hunters Point Project, are considered together. (Ex. 11, Ad.Rec.) However, it was proper for the defendants to consider the relocation problems of the two projects together, and it may have been legally required. If the defendants had stated that there were sufficient vacancies for the residents displaced from one project, without considering the demand for new housing caused by persons displaced from the other, the Plan might well be invalid. If the Plan shows, in a non-arbitrary fashion, that there are enough vacancies to meet the demands of all the projects, then approval of the Plan was valid.

In the light of plaintiffs' four relevant charges, there are serious questions concerning the validity of the Agency's calculations of existing vacancies available for Yerba Buena residents. Without indicating whether these problems alone would justify a preliminary injunction, the Court now proceeds to consider the claims that the vacancies which do exist fail to meet the substantive requirements of § 1455(c)(1) and (c)(2).

■ Plaintiffs claim that the Plan and the Secretary's approval of it violate the statute's requirement that the dwellings used for relocation be "not generally less desirable [than their old residences] in regard to public utilities and public and commercial facilities" and "reasonably accessible to their places of employment." This argument is based on the Plan's statement that "in view of the relatively small area which San Francisco covers and the excellent public and commercial transportation systems in the City of San Francisco, the Agency has designated any area in the City as acceptable for relocation housing." (Ex. 6, Ad.Rec., at 7.) The initial legal question here is whether the statute permits the defendants to consider a whole city as a permissible area for relocation. The Court finds no prohibition in the statute against so doing and, having examined the record in regard to so treating San Francisco, concludes it was not arbitrary to provide that the whole city be used for relocation purposes.

The second substantive requirement of the statute is that the displaced residents shall be provided housing "at rents or prices within [their] financial means." The August, 1967 Plan, covering Western Addition, Hunters Point and Yerba Buena, contains a clear admission by the Agency that this statutory requirement regarding rents cannot be met. That Plan states that the vacancies which exist are at rents which are too high for many of the displaced residents with the lowest incomes. Specifically, the Plan acknowledges that there were "a total of 1087 singles with incomes under $100 per month who would require additional federal or local aids." (Ex. 11, Ad.Rec., at p. 51); and a "total of 508 singles with incomes of $100 or $200 requiring additional Federal or local aids." (*id.* at 52); and "252 families [who] require additional Federal or local aids . . ." (*id.* at 50). Consequently, two of the four conditions which the Secretary required the Agency to fulfill prior to giving final approval dealt with supplemental rent and relocation assistance. The first condition called for the "availability and utilization of relocation aids under the pending Housing and Urban Development Act of 1968 and related appropriation bills". The second called for "adoption by the Board of Supervisors of a resolution or resolutions, satisfactory to the Regional Administrator, specifying the purposes for which money previously appropriated ($300,000) shall be expended, including amounts for rent supplements, and the organizational unit or units having control of such appropriations and expenditures." (Letter of July 29, 1968, from Regional Administrator to Redevelopment Agency, Ex. 11, Ad.Rec.)

Clearly, then, from the Agency's own figures, there were 1,595 single residents in August, 1967, and 252 families for whom the City did not have relocation housing at proper rents. It is also clear that the City intended to supply this housing by rent supplements, not by

new housing. (Letter dated August 15, 1967 from Redevelopment Agency to HUD, item 3, Ex. 11, Ad.Rec.) Therefore, for the Secretary's May, 1969 approval to have been non-arbitrary, there should have been information before him indicating that the rent supplement programs were adequate to meet the needs. This Court has searched the record for any such information. It has searched in vain. Moreover, the rent and relocation supplements are limited by their own terms to a maximum of two years. (*See* letter from Redevelopment Agency to HUD, May 9, 1969, Ex. 11, Ad.Rec., with respect to the time limitation on the federal grants; *see* copy of resolution of San Francisco Board of Supervisors attached to letter of April 24, 1970 from the Redevelopment Agency to this Court with respect to the limitation on the local grants.) Therefore, the rent supplements can only be used to make up the deficiency in low-rent vacancies during the first two years after a resident's relocation. After that time, the rent supplements disappear and the displaced resident is left with a rent which he cannot afford. The use of the supplements to make up for a lack of vacancies could only be justified, therefore, if at the end of the two years, the City shall have built new housing to provide for low-rent residents. However, nothing before the Secretary indicated that this would be done in sufficient quantity and time to house the 1,595 individuals and 252 families or any substantial numbers of either. The limited rent supplements in existence simply do not make up adequately for the lack of low-rent vacancies.

 This Court concludes that it was arbitrary for the Secretary to approve a Relocation Plan which failed to show the sufficiency of rent supplements and which, by its own uncontroverted figures, made it clear that displaced residents would be left without housing within their financial means two years after their displacement.

 The third substantive requirement contained in § 1455(c)(1) is that the relocation housing be "decent, safe and sanitary". The Plan itself shows that, at the time of its submission, the Agency had made no careful check to determine if the projected vacancies were "decent, safe and sanitary". At page 11 of the original Plan approved in 1966, the Agency stated that each rental unit *"will* be inspected" prior to actual relocation. (Ex. 6, Ad.Rec., emphasis added.) The lack of information as to the character of the projected vacancies was not cured by the 1967 Schaffran Report. It stated only that buildings with certificates of occupancy were used in the study. (Ex. 11, Ad.Rec., at 1.) Paper approval does not indicate that a dwelling is "decent, safe and sanitary" within the meaning of the statute. Such a *pro forma* approval provided no real protection of the legitimate needs of displaced persons. Indeed, the defendants themselves admit that a certificate of occupancy does not establish that a dwelling is "decent, safe and sanitary". (Defendants' memo in opposition to a preliminary injunction, Ex. 3; defendants' answers to plaintiffs' interrogatories 7, 13, 14(1) and 15.)

Since the Agency itself had no idea when it submitted the Relocation Plan whether or not the vacancies which it projected were "decent, safe and sanitary", the Secretary of HUD did not have before him information on which to make a determination that the statutory requirements were being met. Therefore, there was no way for the Secretary to give an approval which would not be arbitrary and without basis in fact.

Plaintiffs' final claim is that they are threatened with irreparable damage because defendants cannot provide the adequate relocation housing required under the continuing duty imposed under 42 U.S.C. § 1455(c)(1). While there is some conflict, the weight of the evidence sustaining this claim is overwhelming. (*See, e.g.,* letter from Samuel Jackson, Ass't Secretary for Metropolitan Planning and Development, HUD, to Mayor Alioto, dated March 24, 1970, in regard

to the San Francisco Workable Program, attached to brief of April 1, 1970, submitted as amicus curiae by the Citizens Task Force for a Workable Housing Policy; study by David Bradwell and Associates for San Francisco Department of City Planning, plaintiffs' Ex. C; "A Summary Report on a Survey of Residential Hotels in San Francisco" by Leonard Goodman, February 1, 1970, plaintiffs' Ex. AA; affidavit of Wallace Smith, plaintiffs' Ex. 1; excerpts of statements of John Tolan, Deputy for Development, Office of the Mayor, San Francisco, before House Subcommittee on housing, plaintiffs' Ex. PP; newspaper reports, plaintiffs' Ex. 60; affidavit of Mitchell Forster, plaintiffs' Ex. EE; "Analysis of 20 Hotels," Human Rights Commission of San Francisco, 10/29/69, plaintiffs' Ex. 2; affidavit of Fred Threefoot, Manager of Rentals, San Francisco Housing Authority, plaintiffs' Ex. 84.)

## PLAINTIFFS' CLAIMS RE INADEQUACY OF HEARINGS

Plaintiffs argue in their second cause of action that they have been denied due process of law in that the hearings which were held during the planning of the redevelopment project were constitutionally inadequate. While plaintiffs' claims in this regard tend further to support the granting of preliminary injunctive relief, they need not now be discussed nor disposed of since the Court has found other grounds requiring such relief. The cross motions for partial summary judgment regarding this cause of action are denied without prejudice.

## PLAINTIFFS' CLAIMS RE DENIAL OF EQUAL PROTECTION

Plaintiffs argue in their third cause of action that they are being denied equal protection of the laws by the local defendants in the implementation of the Redevelopment and Relocation Plans. First, plaintiffs state that the defendants are discriminating against minority groups since members of such groups will have a more difficult time finding adequate relocation housing due to private discrimination in the housing market. Second, plaintiffs make the much broader claim that the Yerba Buena project discriminates against all the residents of the area because it takes away their housing without a sufficiently compelling governmental interest. Since neither the plaintiffs nor the defendants have moved for partial summary judgment on this issue, the Court is faced only with the question of whether or not this cause of action, as amplified by affidavits and documents, supports the issuance of a preliminary injunction. The Court has concluded that the motion for a preliminary injunction is sufficiently supported by other considerations. Therefore, the complex questions here involved need not now be considered except to observe that evidence adduced in support of plaintiffs' contentions suggests—when measured against defendants' counter-availing material—the propriety of preliminary injunctive relief. (*See generally* affidavit of Associate Director, Council for Civic Unity, plaintiffs' Ex. 65; plaintiffs' Ex. 66; plaintiffs' Ex. AA, at 10–11. *Compare* defendants' Ex. 8.)

## PLAINTIFFS' CLAIMS RE HOTEL CONSTRUCTION

Plaintiffs maintain in their fourth cause of action that defendants have violated 42 U.S.C. § 1456(g) which declares:

"(g) No provision permitting the new construction of hotels or other housing for transient use in the redevelopment of any urban renewal area under this subchapter shall be included in the urban renewal plan unless the community in which the project is located, under regulations prescribed by the Secretary, has caused to be made a competent independent analysis of the local supply of transient housing and as a result thereof has determined that there exists in the area a need for additional units of such housing."

The facts relevant to this claim are not in dispute. The San Francisco Board of Supervisors has not made the determination referred to in the statute. The official Plan does not include provision for a hotel (Ex. 16, Ad.Rec.). The Redevelopment Agency has referred in a prospectus for developers and in all similar statements to a modern convention hotel to be built in the project area. (Defendants' response to plaintiffs' request for admission number 59; *see' also* plaintiffs' Ex. 74.) The situation, then, is that the Redevelopment Agency has proceeded and is proceeding to purchase and clear land for a hotel which is not in the Plan and which could not now be constructed. Plaintiffs argue that this violates their rights since they will be moved from their dwellings for an illegal purpose. Defendants' response is that the prospectus· is used simply as a method of soliciting alternative proposals and that this Court should not presume that they will act contrary to law. *See generally* Old Town Development Corp. v. The Urban Renewal Agency of the City of Monterey, 249 Cal.App. 2d 313, 57 Cal.Rptr. 426 (1967). Since both parties agree that the hotel is not presently in the Plan and could not be constructed without compliance with § 1456(g), there is no present controversy before this Court for decision.

Plaintiffs' motion for partial summary judgment on this cause of action is denied and defendants' motion for partial summary judgment thereon is granted.

## MINORITY CONSULTATION

Plaintiffs contend in their fifth cause of action that the local defendants have violated the applicable HUD regulations with respect to minority group consultation during the planning of the Yerba Buena Project. Plaintiffs have accordingly moved for partial summary judgment as well as for a preliminary injunction; defendants have opposed these motions and have made separate motions to dismiss for failure to state a cause of action.

The parties disagree at the outset as to exactly which regulation was applicable at the time minority groups were supposed to be consulted. The regulation relied upon by defendants will be deemed controlling for present purposes. That regulation states, in pertinent part:

"When a project will result in a substantial net reduction in the supply of housing in the project area available to minority group families, a Report on Minority Group Considerations (Checklist Code No. R 215), describing:

\* \* \* \* \* \*

(3) Steps taken, and the results achieved, in consulting with representative leadership of the minority group; and the representative character of the leadership consulted."

(Urban Renewal Manual 10–4–2, November 20, 1963, quoted in local defendants' first memorandum in opposition to plaintiffs' motion for preliminary injunction, at 4.) Since Yerba Buena works substantially to reduce housing for all residents of the area, including minority persons, there is no dispute that the regulation applies. The local defendants submitted two reports in attempting to comply with the regulation.

Plaintiffs rely primarily on the first report for their argument that the regulation was violated by defendants. (Ex. 14, Ad.Rec.) In relevant part, that report reads as follows:

"Representative leadership of the minority community has not been consulted on this project because of the events which have taken place in relation to the Western Addition Area 2 Project. . . . [I]n the sweep of national concern for the improvement of rights and opportunities of minority group citizens, the leadership of local civil rights groups has been alerted to take a strong position in opposition to urban renewal. Consequently, civil rights leaders in San Francisco have subsequently taken a militant stand in opposition to the redevelop-

ment of Western Addition Area 2, particularly with reference to the Relocation Program.

. . . [D]ue in part to the unanimous approval given the Area 2 Plan by the Board of Supervisors, there has been a division in the leadership of the NAACP and the United Freedom Movement that makes it difficult to approach minority leaders at this time. For this reason the Redevelopment Agency believes that it is inappropriate to submit the Relocation Program for Yerba Buena Center for consideration by these groups presently. Between submission of Part I and Part II of the Loan and Grant Application will be a more appropriate time."

The report indicates plainly and unequivocally that the defendants disregarded the requirements of consultation with representative leadership of minority groups.

■ The defendants point to a later report which lists several minority group organizations and representatives with whom the Agency had consulted about the Yerba Buena Plan. (Ex. 15, Ad.Rec.) Included in this group were representatives of the NAACP, the Bay Area Urban League, the Community Services Organization (a Spanish-American organization), and the San Francisco Filipino Community, Inc. Defendants contend that this report cured any error in their initial submission.

The plaintiffs maintain that as a matter of law the regulation required the local defendants to report to HUD on the "results achieved" in the minority group consultation. The report actually submitted in this case merely lists the organizations which were contacted. There is no federal interest in requiring consultation without at least some bare description of the nature of the meetings and the "results achieved". Beyond that, the interests of minority groups in having their views before the Secretary are substantial. *See generally* Powelton Civic Home Owners Ass'n v. Department of Housing and Urban Development, 284

F.Supp. 809 (E.D.Pa.1968). In the course of approving local redevelopment plans, the federal defendants make decisions which have a substantial impact on the lives of residents of the area. Because of housing discrimination, this impact often falls most harshly on members of minority groups. HUD recognized this interest by promulgating the regulation in question. Therefore, in light of the explicit language of the regulation, it is clear that the Redevelopment Agency was required to report to HUD on the views of the minority groups consulted. That was not done in this case and the evidence is therefore without conflict in showing that the defendants have failed to comply with regulation 10–4–2 of the Urban Renewal Manual (Nov. 20, 1963). Plaintiffs' motion for partial summary judgment on this issue is therefore granted.

### SUMMARY

1. For present purposes, the Court has not found it necessary to make a final determination on the issues inherent in plaintiffs' claims that they were denied constitutionally adequate hearings prior to final approval of the Plan for the Project. Accordingly, all pending motions to dismiss this cause of action are hereby denied and the cross motions for partial summary judgment are denied without prejudice.

2. Plaintiffs' cause of action grounded in claims that they were denied equal protection of the laws in connection with the Redevelopment and Relocation Plans is not ripe for decision at this stage of the proceedings. Since neither plaintiffs nor defendants have moved for partial summary judgment as to this cause of action, the only matter standing submitted for the Court's decision is the defendants' motion to dismiss. That motion is denied.

3. As to plaintiffs' cause of action claiming unlawful inclusion of a luxury hotel in the Plan, the evidence before the Court makes it clear that there is no present basis for support of this claim. Accordingly, defendants' motion for par-

tial summary judgment in this connection is granted.

4. The evidence adduced in support of plaintiffs' motion for a preliminary injunction is overwhelming in establishing that the defendants have not met the mandate of Congress laid down in 42 U. S.C. § 1455(c)(1) and 42 U.S.C. § 1455(c)(2). Those provisions of the Housing Act of 1949, as amended, require that the Secretary of HUD be presented with evidence that relocation housing will be "decent, safe and sanitary" and "within the financial means" of the persons displaced. That requisite evidence was not so provided. Therefore, there was no basis in fact for the contrary determination made by the Secretary in May, 1969. The record further establishes that there is not now adequate relocation housing in San Francisco which meets the requirements of the Act and is available for persons yet to be displaced from the Project area.

The salutary purposes of the Housing Act of 1949, as amended, are to eliminate blight and provide a "decent home and a suitable living environment for every American family". 42 U.S.C. § 1441. These purposes are not furthered by efforts to relocate persons out of one substandard area into another. The statute makes it abundantly clear that Congress intended residents of blighted areas to be beneficiaries, not victims, of urban renewal.

5. The evidence is overwhelming, too, in showing that defendants wholly failed to comply with the HUD regulation requiring consultation with minority group leaders and requiring report of the results of such consultation. The regulation is particularly important in slum clearance projects because these areas usually, as in the case of Yerba Buena, house significant numbers of minority groups. It is not enough for the local agency to consult the leaders of minority groups. The regulation expressly requires, in addition, that the local agency report to HUD on the results

achieved. While there may have been some such consultation by the local defendants, no report of results was made to HUD.

## CONCLUSIONS OF LAW

1. A preliminary injunction should issue as per Exhibit A attached.

2. No security should be required in connection with the issuance thereof. *See* Urbain v. Knapp Bros. Mfg. Co., 217 F.2d 810, 815 (6th Cir. 1954); United States v. Onan, 190 F.2d 1, 7 (8th Cir. 1951); Western Addition Community Organization v. Weaver, 294 F.Supp. 433, 446 (N.D.Cal.1968); Hurwitt v. City of Oakland, 247 F.Supp. 995 (N.D. Cal.1965).

## PRELIMINARY INJUNCTION

The Court has today filed its Findings of Fact and Conclusions of Law setting forth the reasons for the issuance of this Preliminary Injunction. Accordingly:

1. It is hereby ordered, adjudged and decreed, pending the further order of this Court, that the defendant San Francisco Redevelopment Agency, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them or any of them are, each and all, hereby restrained and enjoined from:

(a) Attempting to remove, threatening to remove, or acting to remove (by initiating contacts or making unsolicited offers or otherwise) any resident in the Yerba Buena Center Redevelopment Project Area D-1 from any premises therein used by such person for residential purposes; and

(b) Breaching, terminating, interfering with or attempting to breach, terminate or otherwise interfere with, any relationship of landlord and tenant pertaining to any premises in said area used by the tenant for residential purposes; and

(c) Raising or attempting to raise the rent of any resident of said area

as to premises used as a residence in said area by such person; and

(d) Reducing or curtailing or attempting to reduce or curtail or to cause the reduction or curtailment of any services or facilities furnished with the residential tenancy in said area of any resident therein; and

(e) Demolishing or attempting to demolish or undertaking to condemn any structure within said area heretofore used in whole or in part for residential purposes or any structure now containing the place of residence of any resident of said area.

2. It is further hereby ordered, adjudged and decreed, that commencing on July 1, 1970, and thereafter until the further order of this Court, the Secretary of the United States Department of Housing and Urban Development, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them or any of them are, each and all, hereby restrained and enjoined from honoring requisitions from the defendant, San Francisco Redevelopment Agency, for Yerba Buena Center Redevelopment Project Area D–1 financing.

3. It is further hereby ordered, adjudged and decreed, that no person restrained and enjoined by this Preliminary Injunction shall undertake to avoid compliance by any indirection.

4. Nothing in this Preliminary Injunction is intended to nor shall permit nor excuse any violation of law by any party.

5. Any person enjoined by this Preliminary Injunction may move for termination upon showing that San Francisco Redevelopment Agency has hereafter submitted evidence (to the Secretary of the United States Department of Housing and Urban Development in an amended or supplemental Relocation Plan) of compliance with all pertinent requirements of 42 U.S.C. § 1455(c)(1) and 42 U.S.C. § 1455(c)(2) of the Housing Act of 1949, as amended, as well as evidence of compliance with all pertinent regulations (including requirements relating to consultation with minority groups) and upon showing, in addition, that said Secretary, having considered such evidence, has thereafter approved said amended or supplemental plan by an approval in writing. Notice of any such motion shall be given to all parties to this proceeding.

6. Any party may, upon notice to all other parties, move for a modificiation of this injunction upon showing that modification is necessary to avoid danger to the safety of any person in said project area or to avoid substantial monetary loss or waste which can be avoided without detriment to any resident of said area or upon any other showing of good cause for modification.

MEMORANDUM CONCERNING
THE COURT'S ORDER OF
NOVEMBER 9, 1970

The attorneys for the plaintiffs and the attorneys for the defendants San Francisco Redevelopment Agency and M. Justin Herman reached an agreement, on October 20, 1970, for settlement of this complex and long-standing litigation. The agreement was promptly ratified by those defendants, but it now appears that plaintiffs have not done so and that further efforts by the parties themselves to reach a settlement are not likely to be availing.

Under these circumstances, the Court itself has sought means for bringing a just end to the litigation. The order signed today has been worked out in that interest. It guarantees full protection to the rights of the residents of the Yerba Buena Center and, at the same time, permits redevelopment to go forward. The order also serves the interests of the community at large, as contemplated by the relevant federal statutes, in providing for construction of a large number of new housing units.

The salient provisions of the order are these:

1. The order insures that no resident of Yerba Buena who is dissatis-

fied with relocation housing need ever leave residence in the Yerba Buena Center unless a board of arbitrators, to be established by the parties themselves to insure fairness and impartiality, finds that the relocation housing offered to the resident fully meets the requirements of the Act of Congress.

2. It orders San Francisco Redevelopment Agency to do everything it offered to do under the agreement of October 20, 1970, which counsel for plaintiffs as well as for the Agency had approved.

3. In addition, it requires the completion, within three years, of a minimum of 1500 units of new or rehabilitated low cost housing. Unless that minimum is exceeded by providing at least 1800 such units, eligible residents of Yerba Buena will have first priority as to 300 units of the new housing. (This provision was ordered to encourage construction of the larger number of units of new housing which, in the Court's view, will result in greater benefit to the remaining residents of Yerba Buena than the provision of priorities on the basis of the lower number of units of new housing.)

4. On August 28, 1970 HUD recertified the supplemental relocation plan for the Yerba Buena Center. To obtain that recertification, the San Francisco Redevelopment Agency made commitments and representations in addition to those which this Court found insufficient last April. Today's order requires the San Francisco Redevelopment Agency to carry out those additional commitments and make good on those new representations.

It is not to be anticipated that today's order will end all problems nor resolve all disagreements which gave rise to this litigation. It is difficult, if not impossible, to satisfy the wishes, on the one hand, of the hundreds of residents in the Center with respect to relocation (some want to stay where they are regardless) and, on the other hand, the demands of the Redevelopment Agency to be permitted to proceed with an urban renewal plan approved by all the duly constituted local and federal authorities.

The order, therefore, is no panacea. The Court intends it to provide a feasible means for reconciling conflicting interests of the parties, so far as possible, without denying the full legal rights of any party. It is not to be expected that all the parties will agree with this assessment of the order and its effect. That is, usually, and in this case, an inevitable consequence. of the decisional process.

The order eliminates any necessity for the Court to make a finding as to whether or not a majority of the plaintiffs have disapproved the agreement reached by counsel on October 20, 1970. It also eliminates the need for the Court now to decide whether or not the recertification by HUD is supported by sufficient evidence.

HUD was not a party to that agreement of October 20, 1970 nor, although invited, did it take any meaningful part in subsequent settlement efforts nor in working out today's order. It may not be amiss to conclude by noting that where this has been characteristic of HUD's participation throughout the course of this litigation.

## ORDER

The Court has fully considered the stipulation of the parties made on October 20, 1970, proceedings subsequently had under the provisions thereof, evidence theretofore and since presented, arguments and memoranda of counsel. The Court has also reviewed its FINDINGS AND CONCLUSIONS dated April 29, 1970 as well as the FINDINGS, RECOMMENDATIONS AND ORDER OF SPECIAL MASTER dated June 18, 1970. This order is based upon all of the foregoing and upon the authority and jurisdiction, in law and equity, vested in this court. It is also based upon the consent of defendants

San Francisco Redevelopment Agency and M. Justin Herman (hereinafter referred to jointly and severally as said defendants).

It is hereby ordered that:

1. Said defendants shall perform diligently and in good faith all of the obligations set forth for performance by them in that certain written agreement dated the 20th day of October 1970. A copy thereof is attached hereto as Exhibit A. Said agreement shall also be deemed to provide that the Fifteen Hundred (1500) units of new or rehabilitated housing referred to in Paragraph SECOND thereof shall be completed within Three (3) years of the date of said agreement and if that residents of Yerba Buena Center eligible for relocation benefits shall have first priority as to at least Three Hundred (300) units thereof unless a total of Eighteen Hundred (1800) units of such new or rehabilitated housing, instead of Fifteen Hundred (1500) shall be completed within said Three (3) years. This order calls for unilateral performance by said defendants of said obligations without any commitments or consideration moving from the plaintiffs or any of them (or from anyone else) to said defendants or either of them.

2. Said defendants shall comply with all commitments, obligations and representations made by the San Francisco Redevelopment Agency or M. Justin Herman, or both, in connection with HUD's August 28, 1970 Findings and Determinations respecting the feasibility of the Supplemented Relocation Plan for Yerba Buena Center, except for such modifications as may lawfully be approved by HUD after Fifteen (15) days advance written notice to plaintiffs and after consideration of such objections, if any, as plaintiffs may make in writing.

3. Said defendants shall refer, to a board of arbitration of three persons (chosen as hereinafter provided) for final decision by that board, each case in which, promptly after any offer of specific relocation or promptly after commencement of relocation proceedings, any person or family to be relocated

thereby makes written objection to the proposed relocation, specifying therein the reasons why the proposed relocation is considered to be at variance with the standards of the applicable statute or statutes of the United States. The board shall promptly, after a reasonable hearing, make its award which will be final and binding upon the parties. No person or family shall be required to move pending the award of the arbitrators as to that person or family. The board shall consist of one member designated by said defendants, one member designated by plaintiffs and a third designated by the first two. If the first two do not agree upon a third on or before December 15, 1970, the third shall be chosen as follows: Said defendants shall arrange, in cooperation with plaintiffs, for the American Arbitration Association to name three individuals residing in or near San Francisco; plaintiffs shall select one of the three who shall be the third arbitrator; if plaintiffs fail so to do within Five (5) days after being notified of the three named, said defendants shall select one of the three who shall thereupon be the third arbitrator. If for any reason, the board of arbitration is not established by January 11, 1971, the Court may make such other provisions for arbitration as it deems equitable. Defendant San Francisco Redevelopment Agency shall provide reasonable compensation for the services and expenses of all arbitrators.

4. Said defendants shall promptly deliver a copy of this order to every person and family residing in the Yerba Buena Center by leaving a copy at the place of residence of each. Each copy so delivered shall have a notice affixed on top of the first page as per Exhibit B hereto attached.

5. Said defendants shall give written notice to counsel for plaintiffs of the name and address of each person or family intended to be relocated at least Thirty-Six (36) hours before making any offer of specific relocation to that person or family, or, if no offer of specific relocation has been made, at least Thirty-Six (36) hours before initiating

any legal procedure (whether the giving of legal notice or otherwise) to effectuate relocation or termination of tenancy.

6. If the Court hereafter decides, after such notice and hearing as the Court may deem adequate, that any of the provisions of this order have not been complied with by said defendants, the Court may thereupon at any time and from time to time take such further action and make such further orders as, in its discretion, it deems necessary or advisable to protect the rights of plaintiffs or any of them. This provision is not a limitation upon any other power of the Court to require compliance with each and every provision of the entire order of this date.

7. The Court reserves the power to take such further steps and make such further orders in connection with these proceedings and all parties as it may deem necessary or desirable in the interest of compliance with the requirements of law and equity.

Defendants San Francisco Redevelopment Agency and M. Justin Herman, each and both, hereby request the Court to make, and hereby consent to the making of, the foregoing order.

San Francisco Redevelopment Agency

By (s) M. Justin Herman
 (s) M. Justin Herman
 M. Justin Herman
 (s) Frederick P. Furth
 Attorney for said defendants

### EXHIBIT A

Agreement made this 20th day of October, 1970, by and between Plaintiffs (hereinafter collectively referred to as "TOOR") in that certain action entitled TOOR, et al. v. HUD, et al., United States District Court, Northern District of California, No. C–69–324 SAW and Defendants San Francisco Redevelopment Agency and M. Justin Herman (hereinafter collectively referred to as "SFRA").

### WITNESSETH:

Whereas, on or about November 5, 1969, TOOR filed a complaint in the United States District Court for the Northern District of California against SFRA and others, Civil Action No. C–69–324 SAW (hereinafter sometimes called "TOOR Litigation"); and

Whereas, on or about April 30, 1970 the Court issued a preliminary injunction in the TOOR Litigation; and

Whereas, after the issuance of such injunction SFRA submitted a Supplemental Relocation Plan to the United States Department of Housing and Urban Development (hereinafter sometimes called "HUD"), which Plan was duly approved by HUD on or about August 28, 1970; and

Whereas, on or about September 2, 1970, SFRA filed a motion to dissolve such preliminary injunction based upon the Supplemental Relocation Plan duly approved by HUD, which motion is scheduled to be heard by the Court on October 20, 1970;

Now therefore, in consideration of the mutual promises and covenants contained herein, TOOR and the SFRA hereby agree as follows:

### FIRST:

The preliminary injunction in the TOOR litigation issued by the Court on or about April 30, 1970, shall be immediately dissolved pursuant to this Agreement.

### SECOND:

SFRA, HUD and the Office of the Mayor of the City of San Francisco each shall in writing commit itself to facilitate the immediate construction of 1,500 units of new or rehabilitated housing in the City and County of San Francisco, encouraging all departments, as appropriate, to work concurrently rather than consecutively, to secure all necessary approvals with a sense of urgency. For the purpose of this Paragraph Second, the phrase "1,500 units of new or rehabilitated housing" shall mean any housing programmed after April 30, 1970, new or rehabilitated, for persons or households of incomes in public housing eligibility categories. None of said 1,500 units shall be comprised of the

units listed on Exhibit A attached hereto; and none shall be comprised of housing units financed through the Federal Housing Administration (FHA) which are not subsidized by Federal Rent Supplements or by benefits available under Section 23 of the Housing Act of 1937 or any other comparable means of subsidy. Additionally, SFRA, HUD and the Mayor shall use their best efforts to have the San Francisco Housing Authority (SFHA) and other appropriate agencies or institutions construct such units.

## THIRD:

SFRA shall maintain and refurbish as hereinafter set forth the Hernon Hotel, Mars Hotel, Imperial Hotel and Jessie Hotel, located within the Yerba Buena Center Redevelopment Project (hereinafter sometimes called "YBC"), in good operable condition, provided however that HUD shall concur within ninety days in the making of certain reasonable and necessary interim expenditures by SFRA in the total amount of $150,000 for such purposes. SFRA will operate these hotels at appropriate rent levels exclusively for the benefit of persons now eligible (or persons who may become eligible as the result of their residence in hotels hereafter acquired in YBC by SFRA) for relocation assistance in YBC (including those displacees who have elected heretofore despite SFRA advice or without SFRA knowledge to live in housing which does not meet relocation standards, and as to such displacees to the extent that vacancies in these hotels are not needed for current YBC residents and to the extent standard relocation resources are not available): SFRA may, in its sole discretion, demolish the hotels listed in this Paragraph Third according to the following schedule: 1) The Hernan Hotel only upon the prior completion of approximately 140 units of the housing identified in Paragraph Second hereof; 2) the Imperial Hotel only upon the prior completion of approximately 260 units of such housing; 3) the Mars Hotel only upon the prior completion of approximately 285 units of such housing;

4) the Jessie Hotel upon the prior completion of approximately 400 units of such housing. In computing the number of units of such housing for the purposes of this paragraph, a unit of such housing may only be used once. SFRA may, in its sole discretion, determine the order of demolition of such hotels.

## FOURTH:

SFRA will encourage the owners of the Planter Hotel to keep such hotel in operation under the same terms and conditions as set forth in Paragraph Third hereof for the benefit of such persons described in Paragraph Third as long as such owner so desires, provided however that SFRA may request the owner of the Planter Hotel to perform the owner-participation agreement of the Official Redevelopment Plan which, *inter alia,* requires the removal of such hotel only upon the prior completion of approximately 415 units of the housing described in Paragraph Second hereof. For the purposes of counting such housing units for this paragraph and Paragraph Third, such units shall only be counted once. In the event the Planter Hotel does not continue to exist until such 415 units of housing are completed, the ratios in Paragraph Third shall change from 3 to 1 to 4 to 1.

## FIFTH:

In the event that the occupancy rate of any of the hotels specified in Paragraph Third herein shall fall below 20 percent and the remaining open hotels specified in Paragraph Third shall have sufficient vacancies to accommodate those persons remaining in said hotel in which the occupancy rate has fallen below 20 percent, SFRA may take appropriate steps to consolidate the occupancy of the hotels, provided however that in no event shall a hotel be closed under this provision within two years from the date of this Agreement.

## SIXTH:

The parties shall not instigate new litigation regarding YBC, directly or indirectly, against each other and shall hon-

or both the spirit and the letter of this Agreement.

### SEVENTH:

The parties shall jointly seek legislation to improve the quality, variety, and suitability of housing needed by persons of low to moderate income, but neither party is under obligation to concur with any other party, nor restrained from seeking such legislation by itself.

### EIGHTH:

TOOR shall have the right to hold weekly meetings in an appropriate and specified room in one of the hotels named in Paragraph Third hereof and shall be immediately given one room rent-free in one of the hotels.

### NINTH:

TOOR and SFRA recognize and represent that the overriding interests of the City, the credit needs of India Basin and the Western Addition Area A–2, jobs for service workers in the completed Yerba Buena Center as well as the needs for good housing by the residents of Yerba Buena Center warrant the cooperation of both parties in constructing low to moderate income housing for the City of San Francisco in expediting the proper rehousing of the residents and the completion of the Yerba Buena Center Redevelopment Project.

### TENTH:

TOOR et al. v. HUD et al., Civil Action No. C–69–324 SAW, United States District Court, Northern District of California shall be immediately dismissed, each party to bear its own costs in the form attached hereto as Exhibit B provided however that the United States District Court shall retain jurisdiction to enforce the provisions of this Agreement.

### ELEVENTH:

The parties shall execute such other documents as are necessary to effectuate the terms and conditions of this Agreement. Further, the parties shall jointly petition such courts as are necessary to effectuate the terms and conditions of this Agreement.

### TWELFTH:

In the interest of providing improved housing opportunities for all persons, eligible for SFRA services, who have been or will be displaced from the Yerba Buena Center Redevelopment Area, SFRA and TOOR shall make all reasonable efforts to persuade the San Francisco Housing Authority to grant to all YBC displacees, eligible for SFRA services, priorities in housing, including but not limited to the 1500 units referred to in Paragraph SECOND hereof and shall endeavor to enlist the support of the Mayor in the accomplishment of this undertaking. SFRA and TOOR further agree that, notwithstanding the services rendered by the New Start Center, there are many more services and aids which residents of YBC need in order to maintain themselves in a better state of health, security and general betterment, and to this end they pledge to establish a working committee of residents constructively motivated, to work with them on such projects, and to implement the programs proposed by such committee insofar as practical.

### THIRTEENTH:

All persons who under HUD regulations fall into the relocation workload and are displaced from YBC are subject to the requirements of 42 U.S.C. § 1455(c).

### FOURTEENTH:

Except as expressly provided herein, SFRA is relieved, at the request of TOOR from any obligation to provide relocation services and thereby will not make any unsolicited contact for any purpose related to relocation or relocation benefits of any person presently or hereinafter residing in any of the five hotels described in paragraphs THIRD and FOURTH, provided however that no sooner than five months prior to the expected occupancy date for the number of new or rehabilitated units of housing, which, pursuant to the terms of para-

graph SECOND hereof, permits the demolition of the particular hotel in which such person resides, SFRA may offer relocation services, provided further however that TOOR shall be notified of such offer and be given an opportunity to discuss the matter with the offeree.

This Agreement was made and entered into the day and year first written above.

TENANTS & OWNERS IN OPPOSITION TO REDEVELOPMENT

BY _____
George Woolf
Chairman and Executive Director

SAN FRANCISCO REDEVELOPMENT AGENCY
BY M. Justin Herman (s)
_____
M. Justin Herman .
Executive Director

Approved and recommended by attorneys of record as follows:

FOR TOOR:
Sidney M. Wolinsky (s)
_____
Sidney M. Wolinsky

Anthony Kline (s)
_____
Anthony Kline .

FOR SAN FRANCISCO REDEVELOPMENT AGENCY:
Frederick P. Furth (s)
_____
Frederick P. Furth

### 3. YERBA BUENA CENTER

#### Public Housing

| HAA NUMBER | LOCATION | ELDERLY UNITS | CONSTRUCTION COMPLETE |
|---|---|---|---|
| Cal 1–21 | Clementina Towers | 276 | Sept. '71 |

### 4. Public Housing
#### (Other Areas in the City)

#### Public Housing—Under Construction

| HAA NUMBER | LOCATION | FAMILY UNITS | ELDERLY UNITS | CONSTRUCTION COMPLETE |
|---|---|---|---|---|
| Cal 1–20 | 3850–18th Street | | 107 | Aug. '70 |
| Cal 1–27 | 350 Ellis Street | | 96 | Dec. '70 |
| Cal 1–28 | 666 Ellis Street | | 100 | May '71 |
| Cal 1–30 | Hermann and Duboce | 4 | 42 | Nov. '70 |
| | | 4 | 621 | |

(Note: 95 units recently completed at 990 Pacific are not listed above.)

| | | | | |
|---|---|---|---|---|
| Cal 1–19 | 1750 McAllister | | 99 | Feb. '72 |
| Cal 1–23 | 1880 Pine Street | | 113 | Dec. '71 |
| Cal 1–22 | 21st and Bartlett | | 110 | Aug. '72 |
| Cal 1–24 & 1–18 | 350 Turk Street to be | | 362 | Jan. '71 |
| Cal 1–31 | Sanchez and Duboce | | 92 | May '71 |
| Cal 1–32 | 1700 block Bush Street | | 108 | Aug. '71 |
| Cal 1–33 | 275 Thrift Street | 1 | | Jan. '70 |
| Cal 1–34 | Allan Wofsy Proposal | 24 | 22 | N/A |
| Cal 1–35 | McSweeney and Schuppel Proposal | 16 | 40 | N/A |
| Cal 1–29 | Arguello Boulevard | | 71 | Aug. '71 |
| Cal 1–36 | 227 Bay Street | | 50 | Jul. '70 |
| | Total in Planning Phase | 41 | 1067 | |

EXHIBIT B

IMPORTANT

THIS IS A FEDERAL COURT ORDER PROTECTING YOUR RIGHTS. It is not a notice to vacate.

FINDINGS OF FACT AND CONCLUSIONS OF LAW RE ORDER PENDING CERTIFICATION BY THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

*Findings of Fact*

1. The United States Department of Housing and Urban Development (hereinafter HUD) has determined that changing circumstances, since its August, 1970, approval of relocation assurances by San Francisco Redevelopment Agency (hereinafter Agency), make it legally necessary for HUD to initiate a new and updated examination of the Yerba Buena Center relocation plan and performance. Said examination will completed by approximately August 16, 1971. Affidavit of HUD Area Director James H. Price, at p. 2–3 (filed June 16, 1971).[1]

2. The Agency has not shown that any land parcels in Yerba Buena Center are scheduled for such early sale or development that either relocation activity or demolition of residential structures is necessary before August 16, 1971. Defendants' Answers to Fourth Set of Interrogatories (filed April 15, 1971).

3. HUD's re-examination of the Yerba Buena Center relocation activities may result in increased relocation rights for persons resident in Yerba Buena Center and may also result in increased impetus to rehabilitate residential structures within Yerba Buena Center. *See* "Report to the Court—Federal Defendants", Section III, p. 2–4, Western Addition Community Organization v. Weaver, No. C–49053 (filed April 1, 1971).

4. Yerba Buena Center residents who move from Yerba Buena Center pending the HUD re-examination may be irreparably injured by the loss of rights which HUD may provide for as a result of its re-examination. All Yerba Buena Center residents may be irreparably injured by the destruction of residential structures that might otherwise be rehabilitated for their use. *See* Finding 3, *supra.*

5. Between now and August 16, 1971, barring some further order of this Court, the Agency will continue in its practices aimed at getting Yerba Buena Center residents to move out. The Agency, absent such order, in that period will also demolish structures which have been used for residential purposes in the past. *See, e. q.,* Local Defendants' Memorandum, at 12–21 (filed June 11, 1971); Affidavit of Robert Pope,

1. Footnote 1 to Finding of Fact numbered 1. For reasons that are not wholly clear at the present time, HUD this afternoon filed, in violation of the rules of this court (LR 114(c)), a paper captioned "Federal Defendant's (HUD) Supplemental Opposition To Motion For Preliminary Injunction" to which is attached an Affidavit of James H. Price. Both documents are dated today and appear to have been filed after the Court today requested counsel for all parties to meet with the Court this afternoon. While the suddenly filed documents might properly be stricken from the record for failure to comply with the Rules of Court, they may remain. The burden of both is to the affect that the earlier affidavit of Mr. Price, filed June 16, 1971, should not be interpreted as a withdrawal of certification or as a decertification of the relocation plan pertaining to the Yerba Buena Center Renewal Project. The Court did not construe the earlier affidavit in any such manner. It manifestly was not a withdrawal of certification or a decertification in form or content. It is highly significant that neither document in any way changes or waters down the earlier sworn statement filed by HUD quoted in the first paragraph of the order today filed. These documents therefore confirm and re-emphasize that there is no change in HUD's concern over existing circumstances as making it necessary for HUD in "the proper carrying out of this program [Yerba Buena] according to applicable law and Department policies to initiate a new and updated examination of the relocation plan, provisions, practices and performance in the Yerba Buena Center Renewal Project".

**1050**

Exhibit II–A to *id.*; Affidavit of David Collins, Exhibit V–2 to *id.*

6. On June 30, 1970, as an Addendum to the "Yerba Buena Center Supplemental Relocation Plan", the Agency submitted to HUD a copy of Resolution 1730–A of the San Francisco Housing Authority and represented to HUD that said Resolution would establish a "prior preference for families and individuals being relocated from Yerba Buena Center" in any future vacancies in public housing in the City of San Francisco. Exhibit 1 to Defendants' Motion to Dissolve Preliminary Injunction, "Yerba Buena Center Relocation Plan", Section 1 (Addendum) at 3 (filed September 3, 1970).

7. On August 28, 1970, HUD approved as adequate the assurances given by the Agency concerning relocation. This approval was based in substantial part upon HUD's finding that Yerba Buena Center residents would have first priority in admission to all vacancies in public housing, due to said Resolution 1730–A. *See* Exhibit 2 to Defendants' Motion to Dissolve Preliminary Injunction, HUD "Findings and Determinations" (filed September 3, 1970); Affidavit of HUD Area Director James H. Price, p. 2 (filed June 16, 1971).

8. On November 9, 1970, this Court ordered defendants M. Justin Hermen and Agency to comply with all representations made by them to HUD in connection with the August 28, 1970 "Findings and Determinations" of HUD. Included in such representations was the claim that Resolution 1730–A would give Yerba Buena residents first priority for public housing vacancies. Order, p. 2 (November 9, 1970); *see* Finding 1, *supra*. The San Francisco Housing Authority has to this date failed to implement Resolution 1730–A. Affidavit of HUD Area Director James H. Price, p. 2 (filed June 16, 1971); Plaintiffs' Motion for Preliminary Injunction, Exhibit 23 (filed June 1, 1971).

*Conclusions of Law*

1. HUD's decision that it is legally necessary to reexamine the relocation plan and practices of the Agency raises serious questions concerning the Agency's compliance with its continuing duties under the law. 42 U.S.C. § 1455(c)(1) (1964); Findings and Conclusions on Motion for Preliminary Injunction, at 10 (April 30, 1970). Violation of 42 U.S.C. § 1455(c)(1) justifies injunctive relief in this case. *See* Western Addition Community Organization v. Weaver, 294 F.Supp. 433 (N.D.Cal. 1968); *Id.*, Order re Western Addition Relocations, No. C–49053 (unreported order filed February 12, 1971); Powelton Civic Homeowners Association v. Department of Housing and Urban Development, 284 F.Supp. 809 (E.D.Pa. 1968).

2. In considering the issuance of an order to preserve the status quo (pending a redetermination by HUD of the Agency's compliance with the law), the Court should balance the following factors: The likelihood that the applicant for the order will prevail on the merits of the Agency redetermination; whether failure to issue the order will result in irreparable injury to the applicant for the order; the substantiality of the harm to the parties opposing the order; and the public interest. *See* Ohio Oil Co. v. Conway, 279 U.S. 813, 815, 49 S.Ct. 256, 73 L.Ed. 972 (1929); Schwartz v. Covington, 341 F.2d 537 (9th Cir. 1965); Virginia Petroleum Jobbers Ass'n v. FPC, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). The balance of these factors in this case at this time mandates the limited order now issued by the Court. No undertaking should be required. *See* Urbain v. Knapp Bros. Mfg. Co., 217 F.2d 810, 815 (6th Cir. 1954); United States v. Onan, 190 F.2d 1, 7 (8th Cir. 1951); Western Addition Community Organization v. Weaver, 294 F.Supp. 433, 446 (N.D.Cal.1968); Hurwitt v. City of Oakland, 247 F.Supp. 995 (N.D.Cal.1965).

ORDER PENDING CERTIFICATION BY THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

The United States Department of Housing and Urban Development having

declared in an affidavit recently filed in this case that "HUD deems it necessary for the proper carrying out of this program according to applicable law and Department policies to initiate a new and updated examination of the relocation plan, provisions, practices and performance in the Yerba Buena Center Renewal Project",

And said Department (HUD) having indicated that it "plans to file with the Court the results of such examination or study, provided that, if HUD is able to accomplish and complete such study in less than 60 days it will do so and file the results at said completion.",

And said Department having been ordered orally in open court on June 22, 1971, to file a report with the Court on the progress of such examination within thirty (30) days of such date,

And administrative responsibility for legal compliance being vested by statute in HUD,

And it being desirable, in case of genuine need prior to the completion of such general examination by HUD, to enable the San Francisco Redevelopment Agency to proceed with relocation efforts or demolition imminently necessary for the orderly implementation of the Yerba Buena Center Redevelopment Project.

Based upon the Findings of Fact and Conclusions of Law today filed,

It is hereby ordered:

1. This entire order (but no prior order) shall terminate ten (10) days (or sooner if the Court so orders) after the filing with this Court of a declaration by the United States Department of Housing and Urban Development (hereinafter HUD) that, in the opinion of HUD, the relocation plan, provisions, practices and performance in the Yerba Buena Center Redevelopment Project conform to all applicable statutes of the United States and to all applicable administrative rules and regulations.

2. Except as expressly provided in this order, no new order is directed to any party; all prior orders are hereby confirmed and remain in full effect.

3. Until the time designated in paragraph 1 hereof, defendants shall undertake relocation efforts in the Yerba Buena Center Redevelopment Project Area D-1 (hereinafter Yerba Buena) only as provided herein. Relocation efforts shall be deemed to include any and/or all of those actions specified in this Court's Order of April 30, 1970, page 1, line 27, through page 2, line 20. Specific relocation efforts shall be permitted upon the filing with this Court of an executed copy of an authorization by HUD for such specific relocation efforts. Such authorization shall include a declaration by HUD that such specific relocation efforts are imminently necessary for the orderly implementation of the Yerba Buena Center Redevelopment Project and do not, in the opinion of HUD, conflict with any applicable statutes of the United States. Any such relocation efforts so permitted shall also comply with the provisions of the Court's Order of November 9, 1970, and all supplements and modification thereof.

4. Until the time designated in paragraph 1 hereof, defendants shall demolish, permit or cause to be demolished structures in Yerba Buena Center, which are now or in the past have been used for residential purposes, only as provided herein. A specific structure may be demolished upon the filing with the Court of an executed copy of an authorization for such demolition by HUD including a declaration by HUD that the said demolition is imminently necessary for the orderly implementation of the Yerba Buena Center Redevelopment Project and does not, in the opinion of HUD, conflict with any applicable statute of the United States.

### MEMORANDUM AND ORDER

The Court has completed its study of the voluminous evidence presented by the parties in connection with plaintiffs' pending motions for injunctive relief. A large body of that evidence is both

uncontroverted and impressive in supporting plaintiffs' claims that defendant San Francisco Redevelopment Agency is failing in its obligations for provision of low cost housing. •

On November 9, 1970, defendant San Francisco Redevelopment Agency made an absolute and unqualified commitment for the completion within three years thereafter of at least 1500 units of new or rehabilitated low cost housing.[1]

Today, more than a year and a half after the commitment was made, the evidence before the Court shows that just 11 units have been completed and that construction has actually begun on only 82 more.

The Agency's commitment has not been changed or modified in any way. It is set out in a court order made at the written request of the Agency, its Director and its attorney so as to avoid an injunction which would then have halted the project altogether for failure to comply with the law.

Plaintiffs correctly point out that physical work has not even started on 1407 of the promised minimum of 1500 units and that less than 16 months remain for completion by November 9,

1973. Plaintiffs claim that there has been far too much delay and that they have been victimized by dilatory and diversionary tactics of defendant San Francisco Redevelopment Agency.[2]

In considering the issues generated by plaintiffs' motions, it must always be remembered that while the federal Housing Act does provide funds of benefit to communities and to real estate developers for urban renewal projects such as Yerba Buena, the statute has another salient purpose. That is to provide decent, safe and sanitary low cost housing for persons needing it. As this Court noted on April 30, 1970:

> . . . the operative terms of the statute make it abundantly clear that Congress intended residents of blighted areas to be beneficiaries, not victims, of the urban renewal provided for by the Act.

One of plaintiffs' present motions is for an injunction to halt the project. In this connection, it is not inappropriate to note that it is already halted.

HUD, in the sound exercise of its responsibilities under governing federal law, has halted relocation in the Yerba Buena project. HUD's action and its

---

1. Fifteen Hundred is the minimum. The commitment calls for 1800 unless defendant San Francisco Redevelopment Agency obtains priority for Yerba Buena displacees for 300 units of public housing. The defendant Agency has not obtained that priority. Therefore, it now appears that 1800 units will be required under the agreement.

2. The essential facts in the long history of this litigation are on record and beyond dispute. Plaintiffs filed suit on November 5, 1969, claiming that the defendants had failed to comply with the requirements of federal law in planning and undertaking to carry out the Yerba Buena Redevelopment Project. After hearings in open court, the Court found that the evidence sustained plaintiffs and issued a Preliminary Injunction.

On May 25, 1970, the then Chief Judge of this Court, the Honorable George B. Harris, appointed the Honorable Edmund G. Brown, former Governor of California, as a Special Master to hold hearings and make factual findings on the controversy as to whether or not the relocation requirements of the Housing Act of 1949 as amended had been met.

On June 18, 1970, the Special Master affirmed plaintiffs' contention that the law forbade proceeding with the Yerba Buena Project unless a large number of additional units of low cost housing were built in the San Francisco metropolitan area. The Special Master recommended that defendant San Francisco Redevelopment Agency be required to produce 2000 units of new or rehabilitated low cost housing in order to comply with federal law.

Thereafter, the plaintiffs and defendant San Francisco Redevelopment Agency undertook to reconcile their differences by agreement. They failed. In order to permit the Yerba Buena Redevelopment Project to proceed, defendant San Francisco Redevelopment Agency, by the signed request of its Director and its attorney, asked the Court to make an order requiring the Agency to provide a minimum of 1500 units of new or rehabilitated low cost housing to be completed not later than November 9, 1973. Relying on this commitment, the Court permitted the Project to proceed.

consequences were repeatedly acknowledged by counsel for defendant San Francisco Redevelopment Agency at the latest hearings in this case.

MR. FURTH: May it please the Court, HUD has stopped the San Francisco Redevelopment Agency from relocating anyone in the Yerba Buena project.

\* \* \* \* \* \*

HUD said . . . in their letter to the Agency of February 28:

"In our letter to the Mayor Joseph Alioto, dated February 23, 1972, we advised the city that no progress will be made in the Yerba Buena Center project until a commitment is made by the city to develop permanent replacement housing for Yerba Buena Center displacees."

\* \* \* \* \* \*

. . . [I]t is not this Court or its orders that have stopped the Yerba Buena project—it is HUD. (Transcript May 10, 1972, pp. 44–46.)

Yet another major—and entirely separate—restraint has been imposed upon the Yerba Buena project. On June 26, 1972 and on July 7, 1972, William O. Douglas, Associate Justice of the Supreme Court of the United States, made orders stopping defendants "from engaging in any physical activities in connection with the Yerba Buena Redevelopment Center" (San Francisco Tomorrow et al. v. Romney et al., 342 F. Supp. 77, N.D.Cal. 1972; United States Supreme Court application A–1327, Orders of June 26, 1972 and of July 7, 1972). The orders are based upon charges of failure to comply with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C). As now provided, the quoted restraint will remain in effect until disposition of the appeal pending before the United States Court of Appeals for the Ninth Circuit.

Turning back to the facts of this case: Defendant San Francisco Redevelopment Agency has repeatedly admitted in open court the unequivocal nature of its commitment to provide the minimum of 1500 new or rehabilitated units of low cost housing. The commitment did not turn and does not turn upon the action or inaction of other governmental entities nor upon the obtaining of governmental or other financing. It is and has always been up to defendant San Francisco Redevelopment Agency to do whatever may be necessary for the timely completion of the minimum of 1500 units.[3]

▮▮▮ Defendant Agency urges that there has been a reduction in the number of families and individuals who continue to reside in the Yerba Buena area. That is true.[4] But it is immaterial. The commitment was made to comply with the law in the light of an over-all shortage of such housing throughout the city of San Francisco. Defendant cannot get rid of its obligation to provide a minimum of 1500 units of new or rehabilitated low cost housing by getting rid of some of those who need it.

▮▮▮ In short, the evidence presently before the Court raises serious questions as to whether defendant San Francisco Redevelopment Agency will be able to meet its legal obligations by its own voluntary deadline date of November 9, 1973. However, this is not dispositive. In ruling upon plaintiffs' motion for a preliminary injunction, the Court should balance the equities. Two factors tip the scale against granting. In the light of the HUD restrictions and of the all-encompassing restraining order issued in the *San Francisco Tomorrow* case, *supra*, additional restraint upon the Yerba Buena project is not only superfluous, but would needlessly damage all prospects of its successful completion. The

---

3. Transcript, November 9, 1970, pp. 11 and 12.

4. The evidence also shows that defendant San Francisco Redevelopment Agency has

not been unwilling to contribute to the rate of attrition.

second factor weighing against an injunction is this: Even though it now appears doubtful that defendant San Francisco Redevelopment Agency will meet its obligation to provide the 1500–1800 units of low cost housing by its own voluntary deadline date of November 9, 1973, there is still enough time left, though just barely, for it to do so.

The Court's denial of the pending motion for injunctive relief will be without prejudice. Therefore, all concerned will do well to bear this in mind: If, at any time hereafter, additional evidence establishes a clear probability that the requisite housing will not be provided on schedule, plaintiffs will be in a very strong position to invoke all Court action necessary to protect their rights.

Plaintiffs' motions are ruled upon in the following manner for the following reasons.

■ Plaintiffs' first contention is that the Amendatory Grant of $4,344,500.00 for the Yerba Buena Redevelopment Project, approved by letter from HUD on February 28, 1972, should be declared void. This contention cannot be sustained. The Amendatory Grant is valid and disbursement of funds pursuant to it will not now be enjoined. Another judge of this court correctly, and on sound reasoning, reached the same conclusion in Ley v. Shell Oil, C–71 1645 RFP (Order, June 20, 1972).

Plaintiffs' next claim concerns § 206 of the Uniform Relocation Assistance Act, 42 U.S.C. § 4626. Section 206 reads:

> If a Federal project cannot proceed to actual construction because comparable replacement sale or rental housing is not available, and the head of the Federal agency determines that such housing cannot otherwise be made available, he may take such action as is necessary or appropriate to provide such housing by use of funds authorized for such project.

■ Plaintiffs ask the Court to invoke the remedial provisions of this Section. Plaintiffs admit that they have made no application to the head (Secretary) of HUD for remedial action. If they believe that the Secretary should take action under the Section on the facts relating to Yerba Buena, plaintiffs should present their case to him. Unless and until it can be shown, at the very least, that the matter has been before the Secretary for consideration, any judicial action based upon the Section would be premature.

The main claim of plaintiffs is grounded in their justifiable concern that the 1500–1800 units of low cost housing will not be completed by November 9, 1973, as promised. Defendant San Francisco Redevelopment Agency contends that it can and will provide those units by the deadline date notwithstanding uncontroverted evidence which shows, to repeat, that no more than 11 units have actually been completed and that construction has begun on only 82. That evidence also shows the average time necessary for processing of projects from funding through completion takes from 15 to 21 months. Even though there are only 16 months to go, defendant San Francisco Redevelopment Agency could make good and should be given the opportunity to do so.

■ The Court has concluded that the ends of justice will best be served by denying without prejudice plaintiffs' present motion for injunctive relief and be requiring defendant San Francisco Redevelopment Agency to provide relevant information, as below ordered, for the benefit of all parties. To avoid misunderstandings as to the required information, the Court must resolve certain definitional disagreements between the parties. The disagreements and the Court's resolutions are set out in the margin.[5]

---

5. While the parties agree that housing "programmed" prior to April 30, 1970, cannot count toward the total of 1500, they disa- gree as to the meaning of the word "programmed". The Court decides that a unit of housing shall be considered to have been

## ORDER

For the above reasons and for other good cause,

It is hereby ordered that defendant San Francisco Redevelopment Agency shall, on or before August 9, 1972, and quarterly thereafter, serve on all parties and file a written, notarially verified report setting forth all facts relevant to showing that the agency will fulfill its commitment for provision of the required 1500–1800 units of low cost housing by November 9, 1973. Each report shall include, in addition to all other information, the facts called for by, and the answers to, the questions set out in Appendix A hereto.

It is further hereby ordered that plaintiffs' motion for injunctive relief is hereby denied without prejudice.

It is hereby further ordered that plaintiffs' motion as to the Amendatory Grant approved by HUD on February 28, 1972, is denied.

It is hereby further ordered that plaintiffs' motion to implement or require implementation of the remedial provisions of § 206 of the Uniform Relocation Assistance Act (42 U.S.C. § 4626) is denied without prejudice.

It is hereby further ordered that, until the further order of this Court, all previous orders of the Court shall remain in full force and effect.

## APPENDIX A

After a brief written description of each low cost housing project which is to be completed in time to meet the November 9, 1973 deadline, answer the following questions relating to that project:

1. Where is the project located? Give exact location.

2. Under which federal assistance program or programs is it being financed?

3. What type and number of units are to be built or rehabilitated?

4. Who is the project sponsor?

5. Has the sponsor been approved in writing by HUD?

6. Has a management organization plan been completed and has it been approved by HUD? If so, where can it be inspected?

7. Is there a rent supplement reservation which will be applied to the project? If so, who has made the commitment of funds, for how long, and where can the commitment be inspected?

8. Does the project meet HUD Site Selection Criteria [See FHA Form No. 3165] and has HUD so stated?

9. Have working drawings been completed? If so, state where they are available for inspection; if not, provide name and address of whoever is preparing them.

10. Have working drawings been submitted to the appropriate local agencies to secure those permits and authorizations necessary to commence construction? If so, to what specific agencies and on what date or dates?

11. Have the local agencies granted the permits and authorizations required to commence construction? If so, name

---

programmed before April 30, 1970, if prior to that date, it had been the subject of any written plan, proposal or study.

Secondly, the parties disagree on whether units may be counted toward the total if first priority for such units is given to displacees from redevelopment projects other than Yerba Buena. The Court decides that such units may be counted. When a new or rehabilitated unit of low cost housing is completed, the result is a net gain in the supply of low cost housing, regardless of who may be the first occupant.

In the third place, the parties disagree on the status of new low cost housing which may be produced when a presently occupied sub-standard unit is rehabilitated. Here, the answer turns on whether the rent charged for that sub-standard unit before rehabilitation was sufficiently low to qualify, on the rent charge alone, as a low cost unit. If so, rehabilitation fails to provide a new low cost housing unit and may not be counted. On the other hand, if a unit has been renting, prior to rehabilitation, for an amount too high to qualify as a low cost housing unit and, if, after it has been rehabilitated, it is put on the market at a rent low enough to qualify for the definition of low cost housing, it should be counted toward the total.

specific agencies and state on what date or dates.

12. Will the project require the temporary or permanent displacement of any present occupants? If so, how many such occupants?

13. In the case of any project requiring temporary or permanent displacement, has an appropriate relocation plan been completed, submitted to HUD and approved by HUD? If so, what was the date of such approval?

14. Has an application or applications been submitted to HUD for a firm commitment? If so, when?

15. Has any application of any kind relating to this project been rejected by HUD? If so, give details showing present status.

16. Has a firm commitment been received from HUD? If not, when is it expected and what reasons support the expectation?

17. Has closing taken place? If not, when is it expected and what reasons support the expectation?

18. If construction has not been started, what written contract(s) require (a) commencement on what date and (b) completion on what date? Where can the contract(s) be inspected?

19. If construction has been started but not completed, what is the date for completion and where can the relevant contract(s) be inspected?

20. If construction has been completed, what was date of completion?

Note: The foregoing information is to be provided seriatim and separately for each project.

### MEMORANDUM AND ORDER

#### *Summary of Decision*

Plaintiffs (TOOR) claim that the United States Department of Housing and Urban Development (HUD) violated the law in certifying San Francisco Redevelopment Agency's (SFRA) most recent rehousing plan for the Yerba Buena Project. That plan includes one or more proposals for temporary relocation of some residents of Yerba Buena. Plaintiffs ask the Court to set aside the certification and to enjoin all relocation and demolition.

For reasons detailed below, the Court will not now set aside the certification nor further enjoin the project. Instead, the matter is referred back to HUD to enable that agency to fill the gaps in the record it has presented in support of certification.

The precise problem is this:

Federal law and regulations require (1) that all proposed relocation housing meet certain environmental requirements and (2) that there be a showing of genuine necessity for any temporary relocation.

At the extended hearing on these questions, neither HUD nor SFRA was able to show any evidence in the record establishing that these requirements had been met. The Court has now completed its own examination of the voluminous exhibits submitted by the contending parties, as well as the 151 page transcript of the hearing. This examination confirms the absence of the requisite facts.

Counsel for HUD have assured the Court that such facts can be readily and promptly supplied. All parties have agreed HUD should be given an opportunity to do so. That opportunity is provided by this decision.

All parties are urged to bear in mind that nothing in this phase of the case changes the unconditional and undisputed obligation of SFRA to complete a minimum of 1500 units of new or rehabilitated low cost housing by November 9, 1973. That time limit is now less than nine months hence. With this in mind, it behooves all parties to settle the disagreements among them. It is high time for an end to this litigation. That can best come about through reasonable compromise between the principal parties rather than through court imposed decree which will otherwise ultimately be necessary. The Court stands ready, if the parties desire settlement assistance,

to hold one or more conferences in that interest under applicable court rules.

## MEMORANDUM AND ORDER

Two basic questions are raised by the present motion before this court. The first: Is there anything on record to show that the San Francisco Redevelopment Agency's most recently revised Rehousing Plan meets the environmental requirements laid down by federal law? The second: Are the proposals in that plan for certain *temporary* relocation of some 150 residents supported by any showing of necessity as required by federal law?

Upon facts and for reasons which will be spelled out in this memorandum, both questions must be answered in the negative.

At the outset, it should be noted that the challenge in this case upon environmental grounds is not addressed to the Yerba Buena Center itself. That challenge has been made in another and separate case (San Francisco Tomorrow et al. v. Romney et al., 342 F.Supp. 77 (N. D.Cal.) in which an injunctive order prohibits the defendants "from engaging in any physical activities in connection with the Yerba Buena Redevelopment Center." That case, it should be re-emphasized, is unrelated to this, it came before a different trial judge, was considered by Mr. Justice Douglas of the United States Supreme Court who issued the injunctive order, and is now pending on appeal before the United States Court of Appeals for the Ninth Circuit.

The challenge in this case on environmental grounds relates to proposed residential housing at various locations in San Francisco outside of the Yerba Buena Center itself.

On October 5, 1972, the federal Defendant, United States Department of Housing and Urban Development (HUD), filed with this Court a document certifying that the Yerba Buena Center Revised Rehousing Plan of September 6, 1972, submitted to HUD by the local defendant, San Francisco Rede-

velopment Agency (SFRA), complied with all applicable statutes, administrative rules and regulations. Claiming that HUD's certification was arbitrary, capricious and unlawful, plaintiffs, Tenants and Owners in Opposition to Redevelopment (TOOR), have moved that the Court set aside the certification and enjoin all relocation and demolition in Yerba Buena Center.

The Court has carefully studied the voluminous briefs and exhibits submitted by the contending parties as well as the 151 page reporter's transcript of oral arguments presented by the three parties in open court on November 14, 1972.

In its April 30, 1970 Order, the court held that 42 U.S.C. § 1455(c)(1)–(2) placed upon HUD and SFRA "a continuing obligation to provide adequate housing at all times during the relocation process"—housing which would meet the required standards of § 1455(c)(1) and all applicable rules and regulations promulgated by HUD. On August 24, 1971, HUD filed with the Court, as part of its continuing duty, a report which questioned SFRA's relocation plan and requested SFRA to submit to HUD an updated and revised rehousing plan. Thereafter, HUD found SFRA's first two revisions (those of December 6, 1971 and of July 17, 1972) unacceptable, and accordingly, refused to grant certification. SFRA made further revisions and submitted to HUD the Revised Rehousing Plan of September 6, 1972. On October 5, 1972, HUD approved this third revised plan, despite objections presented to HUD by TOOR.

 The principles governing the Court's consideration of the matter now before it are clear and well settled. In order that the expertise of administrative agencies such as HUD may be utilized effectively, deference must accorded to their decisions. This deference underlies the "presumption of regularity" attaching to agency decisions. *See, e. g.,* Willapoint Oysters v. Ewing, 174 F.2d 676, 696 (9th Cir. 1949); Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C.

**1058**

399, 379 F.2d 453, 460 (1967). However, the presumption of regularity is never a substitute for the requirement that there must be a factual basis for the decision of the administrative agency.

Putting it in other words, the presumption of administrative regularity cannot stand if there is no factual basis to support the decision of. the administrative agency. "The deference owed to an expert tribunal cannot be allowed to slip into judicial inertia. . . ." American Ship Building Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965).

 The authority governing this Court's review of HUD's certification is set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701–706. Specifically, § 706 states:

The reviewing court shall—

. . . . . .

(2) hold unlawful and set aside agency action, findings and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . .

Judicial review is limited to the legal question of whether or not there was any basis in fact for the certification. The Court cannot resolve that question by speculating as to the basis for HUD's certification. Actual facts contained in the administrative record must be shown to the Court. See, Administrative Procedure Act, 5 U.S.C. § 706; Great Lakes Screw Corp. v. NLRB, 409 F.2d 375, 379 (7th Cir. 1969); American Trucking Assoc., Inc. v. FCC, 126 U.S.App.D.C. 236, 377 F.2d 121, 134 (1966).

At the hearing on November 14, 1972, the Court asked counsel for HUD to point out whatever facts were on record to show that SFRA's revised rehousing plan of September 6, 1972 meets (1) the strict environmental standards required by the provisions of HUD's Relocation Handbook, 1371.1, Ch. 2, pp. 3–4 and 12 and (2) the requirements of HUD's Relocation Handbook, 1371.1, Ch. 2, pp.

15–16, that "extraordinary" circumstances exist to justify temporary relocation of some 150 Yerba Buena residents.

HUD's Relocation Handbook, 1371.1 Ch. 2, pp. 3–4 and 12 provides:

b. *Relocation Standards.* The relocation plan submitted with the application must describe the relocation housing standards to be applied. The standards must meet the following minimum requirements: . . .

(3) *Environmental Standards.* A comparable dwelling unit must be in a location not subjected to unreasonable adverse environmental conditions, natural or man-made; not generally less desirable than the location of the acquired dwelling with respect to public utilities and services, schools, churches, recreation, transportation, and other public and commercial facilities; and accessible to the displaced person's present or potential place of employment. The following are examples of adverse environmental conditions: mudslides, open dumps, undermining, flood plains, air pollution odors, smoke, or dust, major air pollution generators, septic tank backups or sewage hazards (including poorly drained soils or polluted drinking water), rodent or vermin infestations, fire hazards, excessive traffic, and high vibration or impact noises. [Ch. 2, pp. 3, 4.]

. . . . . .

(2) *No individual or family may be referred to a unit which:* . .
(c) *Is in a neighborhood slated for governmental action* unless that action is related to rehabilitation or improvement of neighborhood amenities; or into any *blighted or deteriorating area* (emphasis added) for which improvements are not planned to be undertaken within a short period

of time. In no case shall referral be made to a unit from which it can reasonably be anticipated that the family or individual may subsequently be displaced. Ch. 2, p. 12.

HUD's Relocation Handbook 1371.1, Ch. 2, pp. 15–16 provides:

15. TEMPORARY MOVES.

a. *General.* The local agency will be required to minimize the use of temporary relocation resources. . . .

b. *Conditions Under Which Temporary Moves May Be Approved.* No temporary moves may be undertaken without prior HUD approval, except in a dire emergency. A temporary move will be approved only if the conditions enumerated below are met.

(1) *Families and Individuals.*

(a) *1 The move is necessitated*

(a) in the case of an emergency, (b) where an individual or family is subject to economic hardship or conditions hazardous to his or his family's health or safety, or (c) in *extraordinary situations* (emphasis added) where in the absence of a temporary move, the progress of the project or program would be substantially delayed. . . . Ch. 2, pp. 15, 16.

HUD's counsel, in response to the Court's questions as to facts showing compliance with the quoted requirements, requested leave to supplement the record. All parties agreed that HUD's request might, without objection on the part of any, be granted if the Court should find the record deficient.

The Court, having combed through all that is before it, finds no facts to support a decision that SFRA's Revised Rehousing Plan of September 6, 1972 meets HUD's environmental and temporary relocation requirements. Since counsel for HUD claimed that the whole record upon which it based its certification was not placed before the Court, HUD should be given the opportunity to correct that omission.

The Administrative Procedure Act, 5 U.S.C. § 706, calls upon the reviewing Court to consider the "whole record." In the circumstances of this case at this juncture, the Court should remand to HUD for the purpose of permitting it to present that whole record. *See,* Carnevale v. Gardner, 393 F.2d 889, 891 n.1. (2d Cir. 1968); Kodiak Airways, Inc. v. CAB, 144 U.S.App.D.C. 371, 447 F.2d 341 (1971). That will now be done in the interest of progress toward final resolution of this litigation, now some three years old, and in the interest of justice for all parties.

For the foregoing reasons and for other good cause, it is hereby ordered:

1. The certification by HUD is remanded to enable that agency to supplement the record before the Court with the total administrative record or any part thereof as HUD deems desirable or necessary.

2. Under this remand, HUD or SFRA or both may, if desired by either or both, supplement the record before the Court by adducing additional evidence before HUD not presently a part of its administrative record and thereafter accordingly supplement the record before the Court.

3. Should HUD or SFRA or both supplement the record before the Court as provided for above, all supplementary materials (together with an index indicating by precise reference to pages and paragraphs exactly what specific evidence supports which conclusions in HUD's October 5, 1972 certification) shall be served upon all parties and filed with the Clerk of this Court.

4. TOOR shall have the right, within ten days of its actual receipt of such supplementary materials, to present to HUD, serve upon SFRA and file with the Clerk of this Court any desired controverting material.

5. Not later than seven days after such presentation to HUD or, if no such

**1060**

presentation has been made, not later than seven days after the time for such presentation has expired, HUD shall file a declaration with the Court stating its decision (including any attendant conditions or limitations) with respect to certification of the Revised Rehousing Plan of September 6, 1972, and the reasons for such decision.

6. Until further order of this Court, the Court's Order of June 30, 1971 shall continue in force with the same effect as if no declaration, certification or authorization had been filed by HUD. All other orders of the Court are reaffirmed, remaining in full force and effect except as expressly revoked or modified in writing.

The Court has recently been advised by the parties of the pendency of settlement negotiations. Neither the foregoing order nor any other order in any way precludes them. Moreover, the Court has advised the parties of its continuing availability to conduct one or more settlement conferences in accordance with applicable federal court rules.

Dated: January 11, 1973.

## FINAL ORDER AND JUDGMENT

It appearing to the Court from the record now completed before it:

(1) That the Settlement Agreement between plaintiff Tenants And Owners In Opposition To Redevelopment (TOOR) and defendant San Francisco Redevelopment Agency (SFRA) on May 15, 1973 fully complies with the federal laws requiring adequate relocation housing for residents displaced by urban renewal projects;

(2) That proper notice of the hearing of the plaintiff's motion to approve said agreement and to dismiss this action with prejudice has been given to all parties as well as to the general public;

(3) That no party to this litigation nor any other person has come forward to oppose the motion; and

(4) That justice will be served by granting the motion;

It is therefore hereby ordered, adjudged and decreed that, on plaintiff's motion, the said agreement between plaintiff Tenants And Owners In Opposition To Redevelopment (TOOR) and defendant San Francisco Redevelopment Agency (SFRA) on May 15, 1973 is approved and this action is hereby dismissed with prejudice.